The next case is also Axonics v. Medtronic, 2022, 1534 and 1583. Mr. Powers. Thank you, Your Honor. May it please the Court. The technology at issue in this appeal is quite simple. It's whether you would be motivated to add a sensor to a medical device that is touching a patient's skin to make certain you don't burn that patient. The Board made two errors, which we contend are legal, on the question of motivation to combine. The issue of motivation to combine, of course, is a factual question, and this Court is rightfully skeptical of many opponents' attempt to convert a factual question into a legal question subject to de novo review. I respectfully submit that both of the errors made here are legal ones, squarely within this Court's decision in Belden, which did exactly what we're asking this Court to do, which is reverse a Board's finding of no motivation to combine, because, quote, it rests on legal errors. Each of the two grounds that the Board rested its finding of no motivation to combine rested on a different legal error. The first issue... Didn't the Board have evidence on which it relied that Verreras didn't need a temperature sensor? The Board had two pieces of evidence on which it relied. Neither, I would submit, is substantial evidence, and both committed a legal error. The first theory of motivation to combine was that there is a safety standard requiring that the piece of metal or plastic that is contacting the patient's skin not exceed 41 degrees C, where 37 degrees C is skin temperature. Our argument was, when you're trying not to burn a patient and comply with that standard, it's common sense to have a temperature sensor to make certain you're not over 41 degrees C. The Board's reaction to that was not to dispute that that would be a motivation to combine. That was not what the Board's finding was. The Board's evidence was that it was theoretically possible, theoretically possible, to comply with that standard without a sensor. Well, I don't think that's quite right. I think what the Board seemed to be saying is that there was no known problem of overheating. It was known that these devices could generate heat as a result of the contact of the coils, but there was not a known problem of overheating. And so using a sensor to solve the problem didn't create motivation to combine because of the absence of a known problem in the first place. You're absolutely correct, but that applies to the second argument on motivation to combine. The first was just compliance with the standard alone. And when you look at Appendix 27, their only response to that argument was it's theoretically possible to comply with the standard without a sensor. And the law of this Court is quite clear. Where do they say theoretically possible? They're relying on our expert who said that it was possible, but no one identified an actual device that would have done that. There was this other device that was mentioned later, but when you look at Appendix 27, there's no specific recitation. It's just our expert admitting, I guess you could have a device, but nothing particular. So on Appendix 27, it's, I think, clear. They're relying on that being possible. And that violates this Court's rules that are quite clear that say, to be obvious, it doesn't have to be the best solution or the only solution. It just has to be one that would occur to one of ordinary skill in the art. That's the Bayer Pharma case. Mr. Powers, so you have the burden on this, and I understand that if you have the following kind of evidence, there might be a problem. But the board, as I understand what it did, was to say, we're going to pay attention to what your evidence says, but ultimately the problem is not so much what your evidence says as what it doesn't say. That is, you did not have evidence that there was enough of a recognized possibility of overheating, even if overheating wouldn't occur all that often, but that there was enough of a possibility that a skilled artisan would be motivated to take the step of adding a sensor to protect against it. And I don't see in your brief you're having pointed to anything that fills that gap. And a gap is enough for the board to say you didn't prove your case. Thank you, Your Honor. I think there are two things in the record that fill that gap. The first is Taylor, which is the reference with the sensor, and Taylor specifically suggests adding a sensor to comply with the standard. The quote from Taylor is, A thermistor such as the PT100 can be incorporated in the transmitter to assure that the temperature of the legs does not exceed the requirement for brief patient contact as defined in EN60601, which is the standard that says 41 degrees. So Taylor provides the explicit statement that that's the purpose of having the temperature sensor, is to ensure compliance with that standard. The second piece of evidence, and it's actually three pieces of evidence that fills that gap, Your Honor, are the references that talk about how you have heating in the coils of the charger. And this now translates to the second error that we're asserting, where the board found, and this relates to your question, Judge Syke, the board found that there was no perception of a problem in a charger based on any current heating, because any current heating wouldn't apply in the plastic housing of the charger, which may be true. But it is irrelevant to what we argued was the motivation to comply, which is the risk of heating from the coils in the charger itself. Taylor had a coil heating, and it said you need the sensor to make sure you comply with the standard, and we provided three pieces of reference, three pieces of evidence from references, showing that there is a problem with heating through the coils. It may not happen through any current, but the motivation to combine law and motivation to solve a problem law that we cited in the briefs, say you can't just limit yourself to one particular problem, as the board did. The board limited it to any current heating, which is irrelevant to the problem we identified, which is heating arising from the coils. And the three pieces of evidence, the three pieces of art, let's start with Mitsuki. Mitsuki shows quite clearly, with heating with the coils, that you will get way over 41 degrees C very quickly, based on the calculations and arrangements that they had. That was in figure seven of Mitsuki. And the idea that that doesn't show a heating problem, and that there's no evidence of a heating problem that should be a basis for concern, completely ignores the teaching of Mitsuki. The board's only response to Mitsuki was, well, that wasn't in the context of a physical device that had an implant, etc., etc. Irrelevant. What Mitsuki teaches is, the heating of those coils gets you way over 41 degrees very quickly. And that creates the concern that would motivate someone skilled in the art to say, I think we shouldn't be burning patients. Let's have a sensor to make sure we don't. But that's not just Mitsuki, it's also Carbonaro. Carbonaro was similarly a charging system which contacted the patient's skin, and the specific evidence was that you have to have a sensor to assure, quote, the exterior surface of the chair pad is at 41 degrees or less. That was the teaching of Carbonaro. The third piece of evidence that was in the record is that both sides' experts admit that there is heating that comes from the coils in these chargers. Not the eddy currents. Let's forget about the eddy currents. What they denied was eddy currents. We don't care about eddy currents. What we care is about the risk of heating from the coils. Their experts admitted, Dr. Howler, for example, this is at appendix 2107, Dr. Berger, the appendix at 3053, all admit that there is a risk of heating coming from those coils, which as a matter of just physics is true. You have an energy- Can I just ask, you switched several times between the word heating and overheating. Is that significant? The risk of heating, of course, creates the risk of overheating, but the only- Well, no, in the sense in which that would help you, that's not true. If there's a risk of heating up to, I don't know, 20 degrees C, but no risk of going to 37 or 41 or whatever the figure is, that would not be a relevant risk of heating, even though it was a risk of heating. Understood. Mitsuki makes quite clear, as I said, that the coils could go well over 41 degrees quickly. Carbonaro specifically says the temperature sensor is used to ensure that the exterior surface of the chair pad is at 41 degrees C or less. That tells you that those people skilled in the art were concerned about the exterior surface touching the patient exceeding 41 degrees and put a sensor in that device to make certain it did not. That is a risk of overheating by definition. And the only response from the board, and I want to emphasize this clearly, there were two responses from their expert and one statement from the board adopting both of their responses. The two responses from the expert were, one, there is no risk of overheating or heating from eddy currents because the container is plastic. It's irrelevant. That's not what we're saying the motivation is. It's from the heating of the coils. The second response was to assert in pure Ipsy-Dixon, with absolutely no evidence at all, that there would not be an expectation of a possibility of overheating from the charger. That's what the expert said. He used those words. That's what the board adopted. It followed his words. But when you go to look at the actual language that that expert used, there was absolutely no statement by him supporting the latter part of it. The first part, there was evidence that the eddy currents wouldn't be a problem. That's irrelevant to our argument. The second part, which is actually the key piece, which is a throwaway Ipsy-Dixit line that says, and there would be no perception of heating in the charger, is A, inconsistent with the evidence of record that I've just identified, but B, not supported by any piece of evidence at all. And the legal error of the board was limiting the motivation to combine to one problem, eddy current heating, where this court's case law is very, very clear. You can't limit the motivation to combine to a single problem that the inventor had or somebody else has. Motivation combined could come from anywhere. So the board said at A29 that Matsuki teaches overheating is a concern for a transmitting, charging device implanted just below the skin. What the board seems to be saying is that Matsuki talks about overheating in the implant and not the transmitting device. When you look at Matsuki, figure seven in particular, it's the opposite. Matsuki teaches that the heating of the charger is greater than at the implant. That's what it teaches. Mr. Powers, you're well into your rebuttal time. You can continue or save it. I will definitely save it. Thank you, Your Honor. Mr. Modi. Good morning again, Your Honor. This may please the court. So here before the board, Exonix presented a single theory. Judge Dike, you're right. There was a single theory of motivation where motivation to modify. Judge Toronto, how are you hearing that? It's lovely to hear Mr. Modi's voice. Thank you, Your Honor. So the issue before the board was whether one of ordinary skill would have modified the Barrera 313 recharger with the temperature sensor of Taylor to comply with the safety standard. That is the motivation they put forward before the board. And the board rejected that motivation. Okay, but the key question is did they present evidence of overheating? And they did not, Your Honor. So what about the board's dismissal of these references on 830 in the unlike sentence seems to me a bit confusing. So where does the board say that Matsuki doesn't show overheating in the transmitter? Sure, Your Honor. I think we can actually go right to that. So if you look at the way the board addressed Matsuki, so remember this came in on reply. So the board looked at their arguments, and the board said, and this is at the bottom of page 29, the board said Matsuki evaluates temperature rise on cutaneous energy transmission by a pair of spiral coils, not by a transmitter, and an implanted medical device, much less an implanted medical device, enclosed in a metal housing. So that is a factual finding that is entitled to deference. And how did the board make that finding, Judge Dyke? I think if you look at the way this was framed, again, before the board, they came in and they said, using hindsight, that you would put a temperature sensor using Taylor's device. First of all, Taylor is fundamentally different from the coil charging, the recharger that we have in Barreros 313, right? So at the end of the day, Judge Dyke, if you can go back to how this all was set up in the board's decision, if you go to Appendix 34, again, the board very methodically stepped through the evidence in this case and found in our favor. Did your expert address Matsuki? No, Your Honor, he did not, because it came in on reply. So we did not get an opportunity to address Matsuki, but we do think the board's treatment of it was correct here. The board looked at it, they said, well, this is testing coils in an open space. It's not in the context of a recharger, right? And that's what we have. You have to look at what the question of obviousness was here. It was whether one of skill and the art would take the Barreros 313 recharger, whether they would put a temperature sensor in that recharger, right? And the board answered that question as saying they would not. Exonix simply failed to meet its burden of proof. And we made several arguments to rebut that, right, their motivation. And if you look at the board's decision at Appendix 34, the board points out what their argument was. And then I think what I want to point out is at the bottom of 24, and just like this, I think that's partially to your question, which is Medtronic presented three separate arguments to rebut their showing of motivation. First, Medtronic argued that the system of Barreros 313 did not need a temperature sensor on the transmitter to comply with their asserted 41 degree limitation. That was one. Second, Medtronic argued that Ipposita would not have expected overheating in the transmitter of Barreros 313. That's the second argument we made. And then the third argument, which the board did not reach because it did not need to reach that argument, was Pat Noner argues Taylor's temperature sensor in the transmitter would not have motivated Ipposita to include a temperature sensor in the transmitter of Barreros 313. And what did the board do? The board then methodically stepped through each argument and looked at, with the exception of the third one, it looked at the first two arguments. It sided to the evidence that we presented. I heard counsel for Exonix say, well, we did not present evidence that Barreros 313 would not have resulted in overcharging. We did, Your Honor. Did your expert address the question of whether coil overheating could be a problem, or did he simply say that metallic housing overheating could be a problem but we don't have metallic housing? So, Your Honor, I believe he addressed both of those issues, and I was actually going to give you the citations to that evidence. So Dr. Haller, our expert, testified that Ipposita would not have expected, again, the key issue is the charger in Barreros, which would have the coils, to overheat. And you can find that in Appendix 3229 to 38, paragraphs 20 to 27, and then also Appendix 3261 to 64. So where does he say that's 3229? So, Your Honor, if you look at 3229, actually, we can go to 3264, Your Honor. We can start there, if you like. 3260? 64, Your Honor, paragraph 69. So, before paragraph 69, you'll see that our expert stepped through a lot of the prior art. And then in 69, he says, Dr. Colvin cites no evidence and performs no analysis suggesting that a person of ordinary skill in the art would have believed that Barreros 313 recharger would have been unsafe, that example that it would overheat beyond 41 degrees during transcutaneous recharging. It is my opinion that Barreros 313 does not disclose or suggest that its external recharger would overheat during transcutaneous recharging, nor does any evidence in the record. And without such evidence, a person of ordinary skill would not have been motivated to include a temperature sensor in Barreros 313 recharger to control its temperature. And, of course, this was just his conclusion paragraph, Judge Dike. If you look at the preceding paragraphs, he steps through it very, very carefully. And then the other paragraph that I'll give you, and, of course, paragraph 70 also, if you look, he says, to the contrary, it is my opinion that by acknowledging that temperature during recharging can be a problem but not disclosing controlling the temperature on the implanted device, Barreros 313 makes clear that its external recharger is not expected to overheat. And you can also... Just am I right that the next four, five, six pages is Dr. Heller then addressing why Taylor is a materially different device? That's absolutely right, Judge Toronto. And we believe that further supports the board's conclusion as to no motivation to combine. And that's the point on which I think you said the board didn't get into that issue? That's correct, Judge Toronto. That was our third argument. We made three arguments why Medtronic wins in this case. The board adopted the first two, and it didn't reach the third one. But, of course, that's available to this court. It can look at that evidence and affirm certainly on that basis as well. But I think here the issue is exactly... I gather what Matsuki came in only on reply. Is that true also of Carbonaro, or did Carbonaro come in earlier? So Carbonaro did come in earlier. Matsuki did come in on reply, Judge Toronto. Working in chronological order, where does Heller discuss Carbonaro? Sure, Your Honor, and I was actually going to get to that, so I can give you a site for that if you like, and we can actually go through it. And the board, again, in our mind, adopted what our expert had said. So if you go to Appendix 3243 to 3245, it's paragraphs 35 to 37. So if you look at those paragraphs, you'll see that Dr. Actually, I apologize, Your Honor. Let me just make sure I have the right slide here. Right, so if you look at 35, Your Honor, he addressed this Carbonaro in that paragraph. He notes that Carbonaro, which was another advanced bionics device, is a fundamentally different system with the one disclosed in Barreros 313 and the 112 patent. Carbonaro's recharger was designed to be used with a deeply implanted stimulator, where the implanted device was positioned at a depth of 12 to 15 centimeters in the body with up to 30 degree off-axis misalignment. So there he addresses Carbonaro, and he goes on. Of course, in Paragraph 36, he does that, and Paragraph 37. So again, Appendix 3243 to 3245. And just finally, I guess my notes were suggesting that Mr. Powers said Taylor, Matsuki, and Carbonaro were the evidence on this question of risk of overheating, and I guess we have Haller addressing Taylor and Carbonaro. We don't have him addressing Matsuki because Matsuki came in on reply, right? That is correct, Your Honor, and neither did their expert. They did not bring in a new reply declaration from their expert. So it's just lawyers arguing about Matsuki at this point. You are absolutely right, Your Honor, and which is why the board looked at the arguments and at Appendix 29 to 30, going back to Judge Dyke, some of the passages you pointed out, the board made factual findings based on what was presented to it, and we believe that those are entitled to substantial evidence. And I think Mr. Powers made a reference to the point made by the board at Appendix 29 that Matsuki teaches overheating being a concern for a transmitter charging a device implanted just below the skin. And I don't think that phrase quite says, but I think Mr. Powers is saying that what the board meant there was that the only overheating device of the two is the one underneath the skin, not the one above.  Sure, Your Honor. So I think what was happening here is they pointed to Matsuki as disclosing that this was a study that showed perhaps that the coils and the implant are heated. If you look at Matsuki, that's perhaps one way you could read it. And I think what the board did here was it said, well, fine, even if you look at Matsuki, this is like a computer simulation. It's not like the Barreros 313 recharger that we have here, which is, again, the key question here to Toronto and for the court and for the board was whether anyone of skill in the art would have been motivated to modify the Barreros 313 recharger to put in the temperature sensor from Taylor. And I think when the board looked at Matsuki, they said, well, this is not, in our mind, really relevant to that question. And that's why the board made the factual findings of it. Why is it, as a computer simulation, what would happen with the coils that are contained in the transmitter of Barreros? Why isn't that some evidence that you would have a risk of overheating? Sure. Certainly, Your Honor, I think what perhaps this teaches us is that there is heating of the coils, perhaps more than even the device. But, again, I think the key question here is whether you would take that, right, and then apply that to the Barreros 313 recharger when the evidence of record here shows that you would not. One of skill, we have uncontested testimony from our expert, right, that I pointed, some of it I pointed you to, and it's certainly discussed in our briefs, where our expert, Dr. Heller, came in and said one of skill in the art would not have expected Barreros 313 recharger to overheat. And this is all pure hindsight. They bring in a temperature sensor from a completely different device of Taylor and say, well, aha, here's the, and that's not enough for obviousness. They actually had to come in with reasons and motivations to combine. And the only motivation they presented was based on the safety standard which the board rejected, based on the expert testimony of our expert and their expert. And that's entitled to substantial evidence review and deference here by this court. Unless Your Honors have any other questions, we would ask that the court affirm. Thank you, counsel. Mr. Powers has a couple of minutes for rebuttal. Thank you, Your Honor. I want to focus on two points. The first point is, was there evidence in the record from which one of ordinary skill in the art should have been concerned about overheating from the coils in the charger? Mitsuki answers that question, I think, conclusively. If you look at Figures 3 and 7, it shows the curves going almost vertically at and exceeding 41 degrees after a very short period of time. That alone gives you sufficient evidence. Is there evidence that the Bareris coils are the same as the coils that are being examined in Mitsuki? I don't think they're physically identical, but the method of operation is the same. I mean, they're all the same types of coils, both Carbonaro, Mitsuki, and Bareris, all the same. And so the idea that Mitsuki could be eliminated because it's a computer simulation seems to me irrelevant. It is showing you the heating resulting from those coils. Is there any material that intervenes between the skin and the coils in Bareris? I guess I'm just considering the possibility that maybe the coils get above 41 degrees, but if coils aren't the thing touching the skin and there's some intervening surface, maybe that surface does not get to 41, even if the interior coils and the recharger do. The answer is yes. And, of course, that material, if nonconductive, would, of course, attenuate to some degree the heating coming from the coils. But there is no evidence that the Bareris material would prevent overheating, given the numbers in Mitsuki. And then you have, in addition to that… This is a short scientific article introduced on reply without expert commentary explaining how that article either would or would not translate to an inference for the different device that's in Bareris. And I think for you to prevail on this, you need to have this evidence be so blindingly clear that the board had to find otherwise, based on that reply evidence. If the question is, is there evidence, which is the original question that was posed, is there evidence that the board ignored about a reason for one skill in the art to be concerned? That's clear. It's clear in Mitsuki. It's clear in Carbonaro. It's clear in Wang. That evidence is clear, and that provides the motivation to combine. And what the legal mistake the board made was ignoring that motivation and relying only on the Eddy current motivation, which was irrelevant. The only other point I want to make is that their experts' statement that you heard counsel rely upon is pure Ipsy Dixit. When you look at those paragraphs, it is appendix 3229 to 3238. Those are the sites that the board made as paragraphs 20 to 27. Those paragraphs are pure Ipsy Dixit on the key point, which is not the Eddy current point, but on the key point of whether one skilled in the art would not have been concerned about heating or overheating from a charger, pure Ipsy Dixit. Mr. Powers, your time is up, and that is Ipsy Dixit also. The case is submitted.